**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5029-14T4

STATE OF NEW JERSEY,

      Plaintiff-Respondent,

v.

KASHIF PARVAIZ,

      Defendant-Appellant.

_____

Submitted February 12, 2018 — Decided June 18, 2018

Before Judges Messano, Vernoia, and DeAlmeida.

On appeal from Superior Court of New Jersey,
Law Division, Morris County, Indictment No.
12-06-0665.

Ferro and Ferro, attorneys for appellant
(Nancy C. Ferro, on the briefs).

Fredric M. Knapp, Morris County Prosecutor,
attorney for respondent (Erin Smith Wisloff,
Supervising Assistant Prosecutor and Paula C.
Jordao, Assistant Prosecutor, on the briefs).

Appellant filed a pro se supplemental brief.

PER CURIAM

    A Morris County grand jury indicted defendant Kashif Parvaiz

and his paramour, Antoinette Stephen, for the murder of defendant's

wife, Nazish Noorani. Stephen pled guilty to murder and related charges pursuant to a plea agreement with the State and testified against defendant at trial. A jury convicted defendant of: first-degree murder as an accomplice, N.J.S.A. 2C:11-3(a)(1) and (2); first-degree conspiracy to commit murder, N.J.S.A. 2C:5-2(a)(2) and N.J.S.A. 2C:11-3(a)(1); two counts of second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4(a); two counts of second degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b); fourth-degree possession of hollow-nosed bullets, N.J.S.A. 2C:39-3(f)(1); second-degree endangering the welfare of a child, N.J.S.A. 2C:24-4(a); fourth-degree child abuse, N.J.S.A. 9:6-1 and N.J.S.A. 9:6-3; and third-degree hindering apprehension or prosecution, N.J.S.A. 39-3(b)(4).

After appropriate mergers, Judge Robert J. Gilson sentenced defendant on the murder conviction to life imprisonment with sixty-three years and nine months of parole ineligibility under the No Early Release Act, N.J.S.A. 2C:43-7.2. The judge imposed concurrent sentences on the remaining weapons offenses, a consecutive seven-year term with two years of parole ineligibility on the endangering conviction, and a consecutive three-year term on the hindering conviction.[1]

_____

[1] The judge dismissed the child abuse conviction, reasoning it was a lesser-included offense of the endangering conviction.

Before us, defendant raises the following points on appeal:

POINT ONE

THE TRIAL COURT ERRED IN REFUSING TO DISMISS THE INDICTMENT.

POINT TWO

THE TRIAL COURT ERRED IN GRANTING THE STATE'S MOTION PURSUANT TO N.J.R.E. 104 TO ADMIT DEFENDANT'S ALLEGED STATEMENTS MADE TO MEMBERS OF LAW ENFORCEMENT.

POINT THREE

THE COURT'S PRE-TRIAL RULING ON SEPTEMBER [30], 2014[,] ALLOWED THE POSSIBILITY OF THE STATE INTRODUCING PREJUDICIAL POST-INCIDENT LETTERS WHICH HAD A CHILLING EFFECT.

POINT FOUR

THE TRIAL COURT ERRED IN ALLOWING PREJUDICIAL EVIDENCE BY THE RULING ON THE N.J.R.E. 404(B) MOTION ON APRIL 30, 2014.

POINT FIVE

THE STATE IMPROPERLY ATTACKED DEFENSE EXPERT DR. [STUART] ON HIS FEES EARNED IN UNRELATED CASES.

POINT SIX

THE DEFENDANT'S SENTENCE WAS EXCESSIVE AND DID NOT MEET UNIFORMITY GUIDELINES.

In a supplemental pro se brief, defendant argues:

POINT I

THE TRIAL COURT ERRED IN REFUSING TO DISMISS THE INDICTMENT.

> A) PREJUDICIAL MEDIA COVERAGE
>
> B) LACK OF TESTIMONIAL EVIDENCE
>
> C) EXCULPATORY EVIDENCE NOT PRESENTED
>
> D) DISMISSAL OF WEAPONS CHARGES

POINT II

THE TRIAL COURT ERRED IN GRANTING THE STATE'S MOTION PURSUANT TO RULE 104 TO ADMIT DEFENDANT'S ALLEGED STATEMENTS TO LAW ENFORCEMENT.

POINT III

THE TRIAL COURT'S PRE-TRIAL RULING ON SEPTEMBER 30, 2014[,] ALLOWED THE POSSIBILITY OF THE STATE INTRODUCING PREJUDICIAL, POST-INCIDENT LETTERS WHICH HAD A CHILLING EFFECT.

POINT IV

THE TRIAL COURT ERRED IN ALLOWING PREJUDICIAL EVIDENCE BY THE RULING ON THE 404(B) MOTION ON APRIL 30, 2014.

POINT V

THE STATE IMPROPERLY ATTACKED A DEFENSE EXPERT DR. STEWART [SIC] ON THE AMOUNT OF FEES EARNED IN UNRELATED CASES.

POINT VI

DEFENDANT'S SENTENCE WAS EXCESSIVE AND DID NOT MEET UNIFORMITY GUIDELINES.

We have considered these arguments in light of the record and applicable legal standards. We affirm.

On August 16, 2011, defendant, Noorani and their two young sons were visiting Noorani's family in Boonton to celebrate the end of Ramadan. After sunset, defendant and Noorani went for a walk, with defendant pushing their youngest son in a stroller. Pursuant to an elaborate scheme hatched months earlier, Stephen lay in wait, armed with two different handguns. She approached, shot and killed Noorani, then shot and wounded defendant to make it appear as if the assault were a robbery.

Law enforcement officers and emergency medical technicians arrived and rendered assistance to defendant, who was screaming in pain, having been shot in the wrist, leg, shoulder, and buttocks. Defendant gave conflicting descriptions of his assailants, their number and what they said during the attack to Sergeant Richard Vnencak of the Boonton Police Department and Detective Sergeant Thomas Lesiak of the Parsippany-Troy Hills Police Department. At the hospital, defendant provided two recorded statements to Detective Matthew Potter of the Morris County Prosecutor's Office, consented to Potter's search of his cellphone, and admitted to having an extramarital affair for six years with a woman other than Stephen.

Captain Jeffrey Paul of the Prosecutor's Office arrived at the hospital and questioned defendant further. When defendant

told Paul that what had occurred was "an accident," and he never intended the result, Paul stopped the interview and administered Miranda[2] rights to defendant. Defendant was admitted to the hospital, and Paul took nine additional recorded statements from him, some initiated by defendant's request to continue speaking with Paul. Before some, defendant spoke to family members. In each instance, defendant either acknowledged that he had received Miranda rights earlier and waived his right to remain silent, or waived his Miranda rights after they were re-administered. Defendant admitted that he had a long-standing affair with an unnamed woman and that he planned his wife's murder with a male friend.

Judge Gilson conducted a pretrial hearing regarding the admissibility of defendant's statements pursuant to N.J.R.E. 104(c). Vnencak, Lesiak, Potter, Paul, and Morris County Prosecutor's Office Detective Harrison Dillard testified. Defendant called two witnesses. Officer Brian Ahern of the Morris County Sheriff's Department testified regarding the gunshot residue test he performed on defendant's hands in the early morning of August 17. Lieutenant Stephen Wilson of the Morris County

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

Prosecutor's Office testified that he had directed Potter to obtain defendant's consent to search his cell phone.

As explained in his comprehensive written decision, Judge Gilson found the officers who had initially spoken to defendant at the scene and in the hospital "credibly testified that they viewed [him] as a victim" and were attempting to gather information about "the alleged shooters." After considering the totality of the circumstances, the judge found that defendant "was not in custody or subject to custodial interrogation at the shooting scene, or while he was transported to the hospital, or for several hours at the hospital." Judge Gilson determined that defendant was in custody when Paul administered <u>Miranda</u> rights "some time after 3:30 a.m. on August 17, 2011."

Judge Gilson also found that despite having been shot four times, defendant's wounds were not life threatening and he remained alert during all interviews. The judge listened to the audio recordings and concluded defendant understood and answered the officers' questions "with clear comprehension." The judge concluded

> all statements made by [d]efendant to law enforcement officers up to and including the first interview conducted by [Captain] Paul, were made at a time when [d]efendant was not in custody. Towards the end of [Captain] Paul's first interview, [Captain] Paul advised [d]efendant of his <u>Miranda</u> rights and

A-5029-14T4

> [d]efendant freely and knowingly waived those rights. Thereafter, when [d]efendant twice invoked his rights, the interviews . . . ended, but later [d]efendant reinitiated the communications.

Judge Gilson entered an order permitting the State to introduce evidence of defendant's statements to Vnencak, Lesiak, Potter and Paul, and to play the audio recordings for the jury, subject to appropriate edits and redactions.

Defendant argues the State failed to prove beyond a reasonable doubt that he knowingly and voluntarily waived his right to remain silent. He contends that he was in custody before Paul administered Miranda rights for the first time, and that the officers failed to stop questioning him when he invoked his right to remain silent and failed to re-administer Miranda warnings as necessary.

"Appellate courts reviewing a grant or denial of a motion to suppress must defer to the factual findings of the trial court so long as those findings are supported by sufficient evidence in the record." State v. Hubbard, 222 N.J. 249, 262 (2015) (citing State v. Gamble, 218 N.J. 412, 424 (2014); State v. Elders, 192 N.J. 224, 243 (2007)). "Because legal issues do not implicate the fact-finding expertise of the trial courts, appellate courts construe the Constitution, statutes, and common law 'de novo -- with fresh eyes -- owing no deference to the interpretive

conclusions' of trial courts, 'unless persuaded by their reasoning.'" State v. S.S., 229 N.J. 360, 380 (2017) (quoting State v. Morrison, 227 N.J. 295, 308 (2016) (citations omitted)).

"[T]he protections provided by Miranda are only invoked when a person is both in custody and subjected to police interrogation." Hubbard, 222 N.J. at 266 (citing State v. P.Z., 152 N.J. 86, 102 (1997)). "The critical determinant of custody is whether there has been a significant deprivation of the suspect's freedom of action based on the objective circumstances, including the time and place of the interrogation, the status of the interrogator, the status of the suspect, and other such factors." P.Z., 152 N.J. at 103 (emphasis added). "If the questioning is simply part of an investigation and is not targeted at the individual because she or he is a suspect, the rights provided by Miranda are not implicated." State v. Timmendequas, 161 N.J. 515, 614-15 (1999). See also State v. Melendez, 423 N.J. Super. 1, 24 (App. Div. 2011) (quoting State v. O'Neal, 190 N.J. 601, 618 (2007)) (Miranda warnings are not required prior to questioning if there is "an objectively reasonable need to protect the police or public from any immediate danger associated with a weapon.").

When a suspect unambiguously asserts his right to remain silent, all questioning must stop. S.S., 229 N.J. at 382. Our jurisprudence, however, has extended greater protection. "[U]nder

our state law privilege against self-incrimination, 'a request, however ambiguous, to terminate questioning . . . must be diligently honored.'" Ibid. (quoting State v. Bey (Bey II), 112 N.J. 123, 142 (1988)). Once a suspect has asserted his right to remain silent, "[i]n the absence of . . . renewed warnings any inculpatory statement given in response to police-initiated custodial interrogation . . . is inadmissible." State v. Hartley, 103 N.J. 252, 256 (1986) (emphasis added). "That rule, however, does not apply if the defendant initiates a dialogue about the crime." State v. Harvey, 151 N.J. 117, 222 (1997).

In this case, Judge Gilson concluded the initial questions posed to defendant by Vnencak, Lesiak, Potter and Paul were attempts to investigate the shooting in which defendant was himself a victim. Only when defendant intimated his involvement was more nefarious did his status change to that of suspect. At that point, police administered Miranda warnings before asking further questions.

Judge Gilson carefully reviewed the events that transpired before each recorded statement. He essentially concluded, and we concur, that police stopped questioning defendant whenever he invoked his right to remain silent, began questioning him again when he indicated a desire to continue speaking, and re-administered Miranda rights to defendant as necessary.

10

Defendant notes that the officers who testified admittedly never spoke to any medical personnel before interrogating him. He contends the judge failed to consider the effects of defendant's physical injuries and the medical treatment he was receiving at the time in deciding whether his statements were voluntary. We again disagree.

Even when Miranda warnings are properly administered, "the State bears the burden of proving beyond a reasonable doubt that a defendant's confession is voluntary and not resultant from actions by law enforcement officers that overbore the will of a defendant." Hubbard, 222 N.J. at 267 (citing State v. Hreha, 217 N.J. 368, 383 (2014); State v. Galloway, 133 N.J. 631, 654 (1993)). "Determining whether the State has met that burden requires a court to assess 'the totality of the circumstances, including both the characteristics of the defendant and the nature of the interrogation.'" Hreha, 217 N.J. at 383 (quoting Galloway, 133 N.J. at 654).

Here, Judge Gilson listened to the audio recordings. He credited the officers' testimony that defendant was not confused and remained calm and cooperative. We disagree with the implicit assertion that the judge was unable to assess the voluntariness of defendant's statements without expert medical testimony. We

affirm the judge's order admitting defendant's statements as evidence at trial.[3]

## II.

### A.

We turn to asserted trial errors. The State moved pretrial to introduce evidence of uncharged "bad acts" committed by defendant, see N.J.R.E. 404(b); State v. Foglia, 415 N.J. Super. 106, 122-23 (App. Div. 2010) (N.J.R.E. 404(b) applies to "bad conduct" evidence, even if not criminal), arguing the evidence was probative of defendant's motive and intent to conspire with Stephen to murder Noorani. Judge Gilson conducted a Rule 104 hearing at which the State called numerous witnesses, and entered an order granting in part and denying in part the State's application. In particular, the judge permitted the State to introduce: (1) certain internet messages between defendant and Stephen's sister in which he asked her to purchase poison for him while she was visiting India; and (2) twenty-five emails recovered from

---

[3] In his pro se brief, defendant asserts trial counsel provided ineffective assistance by failing to present any expert medical testimony at the N.J.R.E. 104 hearing. We choose not to address the issue, leaving it for defendant to assert if he seeks post-conviction relief. State v. Preciose, 129 N.J. 451, 460 (1992).

defendant's computer, in which he asked avowed practitioners of voodoo or black magic to cast spells on his wife.[4]

In his written decision that followed the hearing, the judge applied the four-prong <u>Cofield</u> test used to determine admissibility of bad conduct evidence under Rule 404(b):

> 1. The evidence of the other crime must be admissible as relevant to a material issue;
>
> 2. It must be similar in kind and reasonably close in time to the offense charged;
>
> 3. The evidence of the other crime must be clear and convincing; and
>
> 4. The probative value of the evidence must not be outweighed by its apparent prejudice.
>
> [<u>State v. Cofield</u>, 127 N.J. 328, 338 (1992) (citation omitted).]

The judge allowed the State to introduce "the retrieved internet communications [with Stephen's sister]," but limited the sister's testimony to "[d]efendant's statement as opposed to characterization of the communications."

Additionally, the judge found the emails recovered from defendant's computer sent to voodoo and black magic websites were both relevant and reliable. The judge explained:

> Those e-mails, which are in [d]efendant's own words, show his desire to be rid of his wife through any means, including her death.

---

[4] The appeal challenges only the 404(b) evidence admitted by these two rulings.

> Accordingly, the e-mails are highly relevant. The e-mails are also sufficiently reliable to be presented to a jury. Defendant has not disputed that these e-mails are authentic e-mails that he sent. Moreover, the e-mails were all recovered from Defendant's computer.

Judge Gilson reasoned the "key issue" was "whether the e-mails [were] more prejudicial than probative." After carefully considering the fourth prong of the Cofield test, the judge concluded:

> On balance, . . . the e-mails are not more prejudicial than probative. Defendant has denied he conspired to kill his wife, and his motive and intent are critical issues in the case. These emails [sic] go directly to [d]efendant's motive and intent. Significantly, they are [d]efendant's own communications, in his own words. While [d]efendant has argued that the emails are prejudicial, given that they are [d]efendant's own emails, they are not more prejudicial than probative. Moreover, the jury will be given instructions to only consider the e-mails as they go to motive and intent.

Before us, defendant tersely argues Judge Gilson erred in admitting this evidence, which was "extremely prejudicial" and "unrelated to the crime."[5] The argument lacks sufficient merit to

---

[5] In his pro se supplemental brief, defendant argues the emails he sent to the websites were privileged pursuant to N.J.R.E. 511, the cleric-penitent privilege, and protected by the First Amendment. Defendant never raised this argument in the trial court, and so it is not properly before us on appeal. State v. Witt, 223 N.J. 409, 419 (2015). Nevertheless, the argument lacks any merit.

(footnote continued next page)

A-5029-14T4

warrant discussion in a written opinion.  <u>R.</u> 2:10-2(e)(2).  We note only that the decision to admit or exclude evidence under Rule 404(b) rests in the sound discretion of the trial court, to which we accord "great deference" and reverse "only in light of a clear error of judgment."  <u>State v. Gillispie</u>, 208 N.J. 59, 84 (2011) (citation omitted).  Judge Gilson did not mistakenly exercise his discretion, and we affirm for the reasons stated in his written opinion.

B.

While in jail awaiting trial, defendant wrote nineteen letters to Stephen, who was also in custody.  Based upon that correspondence and communications defendant had with another inmate, Michael Brown, a grand jury returned two indictments

--------

(footnote continued)

Because testimonial privileges 'undermine the search for truth in the administration of justice,'" we construe them narrowly, <u>State v. J.G.</u>, 201 N.J. 369, 383 (2010) (quoting <u>State v. Williams</u>, 184 N.J. 432, 444 (2005)), and the party asserting the privilege has the burden of demonstrating it applies.  <u>Horon Holding Corp. v. McKenzie</u>, 341 N.J. Super. 117, 125 (App. Div. 2001).  For the privilege to apply, the communication must be made:  "(1) in confidence; (2) to a cleric; and (3) to the cleric in his or her professional character or role as a spiritual advisor."  <u>J.G.</u>, 201 N.J. at 383-84 (quoting <u>State v. Cary</u>, 331 N.J. Super. 236, 244 (App. Div. 2000)).  Having never made the argument before Judge Gilson, defendant certainly failed to carry his burden.  Moreover, there is no support for the claim that defendant's emails to a public website were made with any expectation of confidentiality.

against defendant alleging witness tampering, N.J.S.A. 2C:28-5(a), and the attempted murder of Noorani's family members and defendant's former paramour. The State sought to join these indictments with the indictment charging defendant with Noorani's murder.

Judge Gilson denied the joinder motion, concluding "the prejudicial impact of the State's evidence would outweigh its probative value" and confuse the jury. He explained that the jailhouse letters would be prejudicially cumulative, because there was "adequate alternative evidence" of defendant's involvement in Noorani's murder, particularly in light of Stephen's agreement to testify against him.

However, in his written decision, the judge specifically declined to address whether the State could introduce the evidence under N.J.R.E. 404(b). Noting there was no motion before the court, Judge Gilson stated:

> One of the principal concerns regarding joinder of the Indictments is the high degree of confusion in using the letters for different purposes in a joint trial. That confusion would not be present if some of the letters were used to show consciousness of guilt or intent to conspire to commit murder. Moreover, under Rule 404(b), those letters could be "sanitized" and more narrowly tailored and thereby avoid the possibility of confusion and prejudice to the Defendant.

It should be further noticed that the Court may need to wait until the trial of this matter has begun before it can appropriately determine the use of the alleged witness tampering letters under Rule 404(b). . . .

Finally, nothing in this opinion or the accompanying Order should be read to preclude the State from making an appropriate motion at trial to use the letters in redirect or rebuttal if Defense counsel opens such a door in the questioning of Antoinette Stephen.

The State never moved before trial to admit the evidence under N.J.R.E. 404(b). Nonetheless, defendant argues the judge's opinion "acted as a 'sword of Damocles,'" chilling defense counsel's cross-examination and summation. The argument not only ignores the trial record but also rests upon a faulty legal premise.

The prosecutor attempted on several occasions to admit the letters into evidence, arguing that defense counsel had opened the door during his cross-examination of Stephen and her sister. Judge Gilson denied those requests. Nothing Judge Gilson said in colloquy with counsel about the possible re-opening of the case if defense counsel strayed in summation from prior rulings was prejudicial, and, indeed, the prosecutor did not object during defense counsel's summation.

Moreover, the premise of defendant's entire argument is that admitting the letters into evidence under any circumstances would

17

have been reversible error.  We disagree with that assumption as a matter of law.  As Judge Gilson noted, the letters were highly probative and, had the State moved pretrial, some of them likely and properly would have been admitted to prove motive and intent. Defendant can hardly claim reversible error when this very damning evidence was kept entirely from the jury.

C.

Defendant called Dr. William Allen Stuart as an expert in emergency medicine.  Dr. Stuart had reviewed defendant's hospital records and police reports, but he never interviewed defendant. It was the doctor's opinion that given the medication administered at the hospital, defendant would have been asleep when Captain Paul interviewed defendant in an unrecorded conversation.  Dr. Stuart also opined that other medication given to defendant makes patients susceptible to suggestion and unable to exercise critical judgment.  During cross-examination, Dr. Stuart acknowledged that he testified predominantly for defense counsel, had collected tens of thousands of dollars in fees every year from 2011 through 2014, and was charging defendant $2000 for the time spent testifying in this case.

Defendant argues the judge erred by permitting the prosecutor to cross-examine the doctor about the fees he earned in unrelated cases.  We find no reversible error.

18                                                       A-5029-14T4

"[O]rdinarily, the scope of cross-examination of a witness rests in the discretion of the trial judge. An appellate court will not interfere with the exercise of such discretion unless clear error and prejudice are shown." State v. Adames, 409 N.J. Super. 40, 61 (App. Div. 2009) (quoting Glenpointe Assocs. v. Twp. of Teaneck, 241 N.J. Super. 37, 54 (App. Div. 1990)).

"The bases on which an expert relies when rendering an opinion are a valid subject of cross-examination." State v. Jenewicz, 193 N.J. 440, 466 (2008). Moreover, historically, the jury may consider the expert's fee as a factor possibly affecting credibility. State v. Smith, 167 N.J. 158, 189 (2001); see also Model Jury Charges (Criminal), "Optional Charge Concerning Compensation of Experts" (approved Oct. 1, 2001) (adopted to address the Court's concern in Smith, 167 N.J. at 189, that the then-current jury charge was inadequate). However, the prosecutor may not denigrate the expert or imply the fees tainted his testimony or that the expert offered testimony contrived with defense counsel's assistance. Smith, 167 N.J. at 184-85; see also State v. Negron, 355 N.J. Super. 556, 576 (App. Div. 2002) (prosecutor's summation made "evidentially unsupported assertions that the experts had sold their integrity for their witness fees").

Here, defense counsel first introduced the subject of Dr. Stuart's fee on direct examination. The prosecutor's summation

19

criticized the doctor's opinions based upon his failure to interview defendant or listen to the audio recordings. He made one fleeting comment regarding the doctor's fees, calling him "a professional witness." Additionally, Judge Gilson provided the Model Jury Charge at the end of the case, which focused the jurors' attention on the proper import of this evidence. Under these circumstances, the prosecutor's cross-examination and summation comments were not reversible error.

## III.

At sentencing, Judge Gilson found aggravating factors three and nine applied to all counts for which defendant was convicted. See N.J.S.A. 2C:44-1(a)(3) (the risk defendant will re-offend); N.J.S.A. 2C:44-1(a)(9) (the need to deter defendant and others). He also found aggravating factor two, N.J.S.A. 2C:44-1(a)(2) (the gravity and seriousness of harm to the victim), only as to the child endangerment conviction, rejecting its application and application of aggravating factor one, N.J.S.A. 2C:44-1(a)(1) (the nature and circumstances of the offenses and defendant's role), to all other counts to avoid "double counting." See State v. Fuentes, 217 N.J. 57, 74-75 (2014) (an element of the offense may not be used as an aggravating sentencing factor to increase punishment).

The judge applied mitigating factor seven. N.J.S.A. 2C:44-1(b)(7) (defendant's lack of criminal history). He fully explained why he rejected other mitigating factors urged by defense counsel. Judge Gilson considered the factors cited by the Court in State v. Yarbough, 100 N.J. 627, 643-44 (1985), in deciding to impose certain consecutive sentences.

Defendant argues the sentence was excessive. He claims that the judge mistakenly considered and weighed the aggravating and mitigating factors, and that the sentence was impermissibly disparate to the one imposed on Stephen. We reject these arguments.[6]

"Appellate review of sentencing is deferential, and appellate courts are cautioned not to substitute their judgment for those of our sentencing courts." State v. Case, 220 N.J. 49, 65 (2014) (citing State v. Lawless, 214 N.J. 594, 606 (2013)). Generally, we only determine whether:

> (1) the sentencing guidelines were violated;
> (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the

---

[6] Defendant also argues the Pre-Sentence Investigation (PSI) report contained objectionable opinions of the probation officer who interviewed defendant regarding defendant's lack of remorse. The argument lacks sufficient merit to warrant discussion. R. 2:11-3(e)(2). It suffices to say that Judge Gilson's thorough oral opinion demonstrates a considered evaluation of the evidence, as well as the judge's own independently reached conclusions regarding the level of defendant's remorse.

record; or (3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."

[Fuentes, 217 N.J. at 70 (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65, (1984)).]

Defendant specifically argues the judge erred in finding aggravating factor three, and in failing to find mitigating factors eight, (the defendant's conduct was the result of circumstances unlikely to recur); nine (the defendant's character and attitude indicate unlikeliness to commit another offense); and twelve (the defendant was willing to cooperate with law enforcement authorities). See N.J.S.A. 2C:44-1(b)(8), (9), and (12).

As to aggravating factor three, Judge Gilson recognized defendant had no prior involvement with the criminal justice system, however, he noted defendant would rather kill his wife than go through divorce proceedings. The judge found defendant's disregard for the law made it likely he would re-offend if necessary to avoid a difficult situation. As to the mitigating factors, it suffices to say that Judge Gilson addressed each one, and we find no reason to disturb his findings as to any. See Case, 220 N.J. at 66 (explaining "the need for the sentencing court to explain clearly why an aggravating or mitigating factor

presented by the parties was found or rejected and how the factors were balanced to arrive at the sentence").

Turning to the disparity argument, pursuant to the plea bargain, in return for her cooperation, Stephen was to receive a recommended sentence of thirty years imprisonment with thirty years of parole ineligibility, the minimum sentence for murder.[7] See N.J.S.A. 2C:11-3(b)(1). Defendant contends that because Stephen was the actual shooter, the life sentence imposed by Judge Gilson should be set aside, and we should remand for resentencing. We again disagree.

Even though "[d]isparity may invalidate an otherwise sound and lawful sentence, . . . [a] sentence of one defendant not otherwise excessive is not erroneous merely because a co-defendant's sentence is lighter." State v. Roach, 146 N.J. 208, 232 (1996) (quoting State v. Hicks, 54 N.J. 390, 391 (1969)).

> The trial court must determine whether the co-defendant is identical or substantially similar to the defendant regarding all relevant sentencing criteria. The court should then inquire into the basis of the sentences imposed on the other defendant. It should further consider the length, terms, and conditions of the sentence imposed on the co-defendant. If the co-defendant is sufficiently similar, the court must give the sentence imposed on the co-defendant substantive weight when sentencing the

---

[7] Defendant's appellate brief actually misstates Stephen's exposure as "thirty years flat."

defendant in order to avoid excessive disparity.

[Id. at 233.]

Here, Stephen was not sentenced at the time of defendant's sentencing hearing. Trial counsel's argument was not that any sentence greater than that anticipated for Stephen was per se disparate; rather, he argued that since Stephen fired the fatal shots, defendant should receive no greater sentence than Stephen. Under the circumstances, Judge Gilson's failure to specifically address the issue is understandable. The appellate record contains neither Stephens' judgment of conviction nor the PSI report prepared in that case.

Although all these circumstances limit our review in the fashion outlined by the Court in Roach, we assume arguendo that Stephen received the sentence anticipated by the plea bargain and conclude defendant's sentence was not impermissibly disparate.

Initially, we have repeatedly recognized that a co-defendant's cooperation with law enforcement may justify ostensible sentence disparity. State v. Williams, 317 N.J. Super. 149, 159 (App. Div. 1998); State v. Gonzalez, 223 N.J. Super. 377, 393 (App. Div. 1988). Additionally, our review of the trial evidence makes it abundantly clear that defendant, not Stephen, was the "mastermind" and intended beneficiary of the plot. The

evidence also revealed that defendant repeatedly lied to and misled Stephen about his family situation. Finally, Judge Gilson found that defendant had consciously decided to place his own child's life at risk and lacked remorse for his wife's brutal murder.

While sentence disparity exists in this case, the circumstances and conduct of Stephens were not "identical or substantially similar to [that of] defendant." Roach, 146 N.J. at 233. The sentence imposed on defendant was lawful and justified, and we affirm.

IV.

Defendant argues it was error to deny his pre-trial motion to dismiss the indictment. He argues that the crimes garnered extensive media coverage, and the prosecutor failed to adequately ensure the grand jurors were free of taint and able to fairly consider the evidence. He also contends the presentation lacked sufficient "testimonial evidence" and consisted largely of hearsay. Lastly, defendant claims the prosecutor failed to present exculpatory evidence. None of these arguments is availing.

"The trial court's decision denying defendant's motion to dismiss h[is] indictment is reviewed for abuse of discretion." State v. Saavedra, 222 N.J. 39, 55 (2015) (citing State v. Hogan, 144 N.J. 216, 229 (1996)). "[B]ecause grand jury proceedings are entitled to a presumption of validity," defendant bears the burden

of demonstrating the prosecutor's conduct requires dismissal of the indictment. State v. Francis, 191 N.J. 571, 587 (2007) (citing State v. Engel, 249 N.J. Super. 336, 359 (App. Div. 1991)).

Undoubtedly, the prosecutor has an absolute duty to bring potential bias or partiality on the part of a grand juror to the attention of the assignment judge. State v. Murphy, 110 N.J. 20, 33 (1988). Before doing so, "the prosecutor may make a threshold finding to determine if the facts as presented by the grand juror have the potential for bias or interest." State v. Brown, 289 N.J. Super. 285, 291 (App. Div. 1996).

Judge Gilson carefully reviewed the prosecutor's inquiry of the grand jurors before presenting any evidence on the first day of the proceedings, as well as the additional questions and cautionary instructions the prosecutor provided later that day and on the second day of the presentation. The judge concluded the prosecutor's conduct was more than adequate and "there was no showing of even a possibility of bias or partiality." We agree.

Defendant next contends the evidence actually adduced before the grand jury was largely hearsay elicited through leading questions posed by the prosecutor. This is clearly so. However, a grand jury may return an indictment based primarily upon hearsay testimony or other evidence that would be inadmissible at trial. See, e.g., State v. Tringali, 451 N.J. Super. 18, 26 (App. Div.

2017). Moreover, "procedural irregularities in a grand jury proceeding are rendered harmless where defendant is ultimately found guilty by petit jury." State v. Warmbrun, 277 N.J. Super. 51, 60 (App. Div. 1994) (quoting State v. Ball, 268 N.J. Super. 72, 120 (App. Div. 1993)). Defendant's argument requires no further discussion.

Lastly, defendant argues the prosecutor failed to present exculpatory evidence to the grand jury, namely, the negative results of a gunpowder residue test performed on defendant shortly after the shooting, and documentary evidence that Stephen sent money to defendant on multiple occasions. He argues this latter evidence served to rebut the State's contention that defendant sent money to Stephen shortly before the murder to facilitate the crime.

In Hogan, 144 N.J. at 235, the Court held that prosecutors generally have no duty to provide the grand jury with evidence beneficial to a defendant. However, "in the rare case" when the prosecutor's file contains "credible" evidence "that both directly negates the guilt of the accused and is clearly exculpatory," the evidence must be provided to the grand jury. Id. at 237.

Here, Judge Gilson concluded, and we agree, this evidence did not directly negate defendant's guilt nor was it clearly exculpatory. Moreover, a finding of guilt by a petit jury renders

27

harmless any failure to present exculpatory evidence to the grand jury.  State v. Cook, 330 N.J. Super. 395, 411 (App. Div. 2000).

Affirmed.[8]

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

---

[8] To the extent we have not otherwise addressed assertions made in defendant's pro se filing, they lack sufficient merit to warrant discussion, Rule 2:11-3(e)(2), or otherwise were never advanced in the trial court.  Witt, 223 N.J. at 419.

A-5029-14T4